STATE OF LOUISIANA IN     *     NO. 2023-CA-0383
THE INTEREST OF K.M.

                      *

                      *     COURT OF APPEAL

                      *     FOURTH CIRCUIT

                      *     STATE OF LOUISIANA

                   * * * * * * *

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. J-2022-026-D, DIVISION "B"
Honorable Michael D. Clement,
* * * * * *
**Chief Judge Terri F. Love**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Sandra Cabrina Jenkins, Judge Karen K. Herman)

Charles Joseph Ballay,
District Attorney, 25th JDC Plaquemines Parish
Mary Slavich Touzet
Assistant District Attorney
333 F Edward Hebert Blvd, Building 201
Belle Chasse, LA 70037

      COUNSEL FOR STATE/APPELLEE

Jessica F. Hawkins
P.O. Box 5072
Baton Rouge, LA 70802

Ryan K. Thompson
660 Richland Ave
BATON ROUGE, LA 70806

      COUNSEL FOR DEFENDANT/APPELLANT

                                        **AFFIRMED**

                                        **AUGUST 10, 2023**

**TFL**

**SCJ**

**KKH**

This is a juvenile delinquency matter. The juvenile, K.M.,[1] was adjudicated delinquent for reckless operation of a vehicle (La. R.S. 14:199), unlawful operation of an off-road vehicle (La. R.S. 32:299), aggravated obstruction of a highway (La. R.S. 14:96), aggravated flight from an officer where human life is endangered (La. R.S. 14:108.1), and resisting an officer (La. R.S. 14:108). On appeal, K.M. argues the trial court erred in the following respects: (i) La. R.S. 14:96—the aggravated obstruction of a highway statute—is unconstitutionally vague and overbroad; (ii) the evidence was insufficient to support K.M.'s adjudication on the charges of aggravated flight from an officer where human life is endangered ("aggravated flight") and resisting arrest; and (iii) Deputy Dylan Goff's testimony regarding a

_____

[1] La. Ch. C. art. 412(A) provides the following:

> Records and reports concerning all matters or proceedings before the juvenile court, except traffic violations, are confidential and shall not be disclosed except as expressly authorized by this Code. Any person authorized to review or receive confidential information shall preserve its confidentiality unless a court order authorizes them to share with others.

Accordingly, this Court will use the juvenile's initials, K.M., in this matter to protect his confidentiality.

1

video of the subject incident was inadmissible hearsay as it was not based on the deputy's first-hand knowledge.

We find that La. R.S. 14:96 is constitutional, the totality of the evidence was sufficient to convict, and Deputy Goff's testimony regarding the video was properly admitted into evidence. Accordingly, we affirm K.M.'s adjudication and disposition on all counts.

## PROCEDURAL HISTORY

Plaquemines Parish Sherriff's Office ("PPSO") deputies received a "Signal 99" dispatch—reckless operation of a vehicle—involving multiple ATVs and a dirt bike in the vicinity of Woodland Highway and Belle Chasse Highway.[2] K.M. was on the dirt bike. After a pursuit, PPSO officers arrested K.M.

The State filed a petition for delinquency against K.M. for reckless operation of a vehicle, unlawful operation of an off-road vehicle, aggravated obstruction of a highway, aggravated flight; and resisting an officer. K.M.'s pre-trial motions included a motion to quash the bill of information. The motion to quash maintained that La. R.S. 14:96—aggravated obstruction of a highway—was unconstitutionally vague and overbroad. The trial court denied the motion. After the hearing on the merits, the trial court adjudicated K.M. delinquent on all counts as specified in the petition for delinquency. Thereafter, the trial court ordered a pre-disposition investigation ("PDI") and fixed the matter for disposition. At the disposition hearing, the trial court imposed the following sentences:

1. Reckless Operation of a Vehicle (La. R.S. 14:199): six (6) months in the Correctional Center (suspended) and two (2) years of juvenile probation.

---

[2] Woodland Highway is also referenced herein as LA 406 and Belle Chasse Highway as Highway 23.

2. Unlawful Operation of an Off-Road Vehicle (La. R.S. 32:299): fifteen (15) days in the Correctional Center (suspended) and two (2) years of juvenile probation.

3. Aggravated Obstruction of a Highway (La. R.S. 14:96): two (2) years in the Correctional Center (suspended) and two (2) years of juvenile probation.

4. Aggravated Flight (La. R.S. 14:108.1): two (2) years in the Correctional Center (suspended) and two (2) years of juvenile probation.

5. Resisting an Officer (La. R.S. 14:108): ninety (90) days in the Correctional Center (suspended) and two (2) years of juvenile probation.

All the sentences were to run concurrently.

After the disposition hearing, K.M. timely filed the present appeal.

## FACTUAL HISTORY

The facts as developed through witness testimony and exhibits offered at the adjudication hearing included the following:

Coretta Espadron

Ms. Espadron, the dispatcher for the PPSO, testified that she received the call related to some motor bikes on the road. Ms. Espadron identified the audio of a call the State introduced into evidence. In the audio, the caller/driver reported eight people on motorbikes with no helmets and no lights; that "we almost hit the bikes;" and that the cyclists were headed towards the Belle Chasse Highway area. Ms. Espadron dispatched the caller's complaint to PPSO deputies. She stated the dispatch did not include the caller's statement that the bikes were nearly struck. Ms. Espadron also clarified on cross-examination that the caller mentioned ATVs, not dirt bikes.

Sergeant Anthony Dugas

3

Sgt. Dugas testified that he received a complaint related to multiple ATVs on the roadway travelling on Woodland Highway towards Belle Chasse Highway. Sgt. Dugas was in a fully-marked vehicle with identifying decals. A video recorder mounted on his patrol unit captured his response to the call.[3] The State played the video generated from Sgt. Dugas' unit ("the video") and examined Sgt. Dugas on the events depicted in the video.[4] Sgt. Dugas asserted that in addition to ATVs, he saw a dirt bike which had no headlamps on it. Sgt. Dugas said he activated his overhead emergency lights and sirens to follow the convoy of the off-road vehicles. He observed the ATVs and the dirt bike heading towards Belle Chasse Highway. The first traffic violation Sgt. Dugas noted was that the off-road vehicles were not permitted to be on any highway or roadway. As to the dirt bike, in particular, he stated it had no tail lights or headlights and observed that it was veering towards the centerline.

Sgt. Dugas specifically followed the dirt bike and one of the ATVs. Sgt. Dugas observed a white pick-up truck to the right of the ATV that he was following. He asserted that the pick-up truck applied his brakes to avoid a collision with the convoy of ATVs that had crossed over two lanes of traffic to turn onto Belle Chasse Highway. As the ATV and K.M. entered Belle Chasse Highway, K.M. looked back at Sgt. Dugas, acknowledged Sgt. Dugas' presence, changed lanes without signals, and executed a u-turn from the right lane of Belle Chasse Highway to travel southbound. Sgt. Dugas asserted that the presence of

_____

[3] Sgt. Dugas stated that the video did not include complete audio. He explained that the PPSO "L3" system in existence at the time of the incident was becoming outdated and often lost or distorted the audio.

[4] The State introduced the video into evidence without any objection.

K.M. and the other ATV operators caused the other motorists to be stopped on Belle Chasse Highway.

Sgt. Dugas stated that as he pulled alongside K.M., he yelled verbal commands on two occasions for K.M. to "stop the bike," "pull over", and "stop." In response, Sgt. Dugas said that K.M. did not stop; instead, K.M. drove onto the sidewalk, grass area, and then returned to the roadway in front of Sgt. Dugas' vehicle. Sgt. Dugas relayed that K.M. continued south on Belle Chasse, executed a left turn while disregarding a red light, veered through three lanes of traffic with cars waiting to turn left on Woodland Highway, and made another u-turn to travel back north onto Belle Chasse Highway. Sgt. Dugas contended that the improper u-turns, along with K.M's failure to obey stop and yield signs, along with red signal lights, created a dangerous situation not only for the other driving motorists, but also for K.M. In explaining the charges against K.M., Sgt. Dugas maintained that the manner in which K.M. drove his dirt bike amounted to reckless operation of a vehicle; that the dirt bike was an off-road vehicle as it was not registered; and that the need for other motorists to brake and yield to K.M. constituted aggravated obstruction of a highway. Sgt. Dugas added that it was foreseeable that human life could be in danger, noting that the incident happened at dark, on a Saturday evening, and on the primary travel artery to enter and exit the parish.

Sgt. Dugas averred that he and another PPSO officer, Agent Joseph Francis, who had been traveling southbound on Belle Chasse highway, executed a "box maneuver." He described the box maneuver as a technique designed to slow down a fleeing motorist and get the motorist off of the roadway. This maneuver forced K.M. off the roadway, at which time his dirt bike became entangled in sand, loose gravel, large rocks, and other debris. Notwithstanding, Sgt. Dugas said that based

on his observations, K.M. was still attempting to flee. He pointed out that K.M. remained straddled on the dirt bike, his hands were on the throttle, and the fender jerked forward. Sgt. Dugas stated he yelled multiple times for K.M. to "[g]et on the ground. Get on the ground." Based on his concern that K.M. was not following his commands and would flee, Sgt. Dugas grabbed K.M. under the arms and took him to the ground. The dirt bike fell on top of both of them. He instructed K.M. to "[g]ive me your hand. Give me your hand. Stop resisting." Sgt. Dugas described K.M.'s resistance, in part, as "tensing up." At this point, he said Agent Francis saw that Sgt. Dugas was struggling with K.M. Agent Francis had a taser in his hand. However, Agent Francis did not use the taser.[5] Instead, Agent Francis employed a "kick strike" for pain compliance. Sgt. Dugas testified that the first kick hit him. Agent Francis' second kick struck K.M. Sgt. Dugas testified that K.M. stopped resisting after the second kick and that he was able to place K.M. in handcuff restraints. Thereafter, Sgt. Dugas provided K.M. with the warnings required by *Miranda*.[6]

Sgt. Dugas stated that another officer, Devin Bourgeois, transported K.M. to the Belle Chasse lock-up.[7] He advised that Deputy Dylan Goff prepared the police report of K.M.'s arrest and other incidents involving the ATVs.[8]

---

[5] Both Sgt. Dugas and Agent Francis testified that fluid was leaking from the dirt bike. Each said that the leakage, a potential fire hazard, contributed to Agent Francis' decision not to employ his taser.

[6] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966).

[7] K.M.'s father and mother arrived on the scene after K.M.'s transport to lock-up. The father attempted to retrieve the dirt bike; however, was advised that he could not.

[8] K.M.'s arrest was a part of the written police report which included multiple scenes involving the ATVs. In particular, Sgt. Dugas testified that the ATV he attempted to follow during his pursuit of K.M. was involved in a hit and run accident with another vehicle in the tunnel.

On cross-examination by defense counsel, Sgt. Dugas acknowledged that the probable cause affidavit he completed did not reference his lights and sirens. He also conceded that the indicators on his dash cam video showed that only his lights—not his sirens—were working. However, Sgt. Dugas stated that "there's no possibility" that his sirens were not activated. He attributed the dash cam's failure to document the activation of his sirens as a default in the system that sometimes occurred. Sgt. Dugas also admitted that his probable cause affidavit did not expressly mention that he advised K.M. of his *Miranda* rights or discuss the use of force by Agent Francis. He stated that his failure to mention that his sirens were activated, K.M.'s *Miranda* warning, and Agent Francis' use of force in his probable cause affidavit were mistakes of omission. He clarified that Agent Francis' use of force was not illegal under PPSO guidelines.

Sgt. Dugas verified that he did not document any instances where K.M. exceeded the speed limit. He denied that he forced K.M. off the road prior to the implementation of the box maneuver. Sgt. Dugas recognized that at some points during his pursuit of K.M. that motorists travelling opposite to the red light(s) that K.M. had gone through had already stopped and/or were "slow-moving." He attributed the motorists' actions to the fact that PPSO authorities had stopped opposing traffic. Notwithstanding, Sgt. Dugas could not definitively rule out the possibility that K.M. could have run into someone. Sgt. Dugas could not recall the precise time he told K.M. that K.M. was under arrest; instead, Sgt. Dugas said he "implicated" to K.M. that he was under arrest at the time he read K.M. his *Miranda* rights.

On re-direct examination, Sgt. Dugas reiterated that he had on his sirens. He noted that the L-3 system also did not illuminate his brakes; however, he attested

7

that his brakes were functioning properly at the time of the incident. Sgt. Dugas added that a short amount of time lapsed in between the time he grabbed K.M. off the dirt bike and the time he left his unit because of the urgency of preventing further flight.

Agent Joseph Francis

Agent Francis testified that he was off-duty, driving an unmarked Tahoe, when he saw two four-wheelers "flying" past him in the northbound land. When he turned on his radio, he heard sirens and determined that officers were chasing persons on dirt bikes and four-wheelers. The State played the video and examined Agent Francis as to its contents after Agent Francis verified that he could recognize events from the video.

Agent Francis testified that he saw lights flashing from Sgt. Dugas' unit as Sgt. Dugas chased the four-wheelers. Eventually, Agent Francis said he made a permanent stop of traffic near Belle Chasse Highway and G Street to prevent the cyclists and other motorists from hitting each other. Agent Francis opined that there was a foreseeability that human life could be in danger. Agent Francis explained that the ATVs violated the law by making a u-turn, cutting directly in front of traffic. He highlighted a u-turn made by Sgt. Dugas while still in pursuit of the dirt-bike. Based on his observation, Sgt. Dugas remained within the dash lines of the road. At that time, the dirt-bike driver had ridden onto the sidewalk. Agent Francis stated that he was behind Sgt. Dugas and observed K.M. look directly back at Sgt. Dugas. He stated that K.M. and the other four-wheelers ran straight through a red light and did not stop. According to Agent Francis, this action was dangerous inasmuch as the traffic from Belle Chasse Highway had a

green light to turn left or go straight. Agent Francis expounded that the other motorists were obstructed because they had to stop for K.M. and the four-wheelers as they went through the red light.

Agent Francis maintained that he saw K.M. flee from the police and fail to obey stop, yield or traffic control signal devices. He specifically cited that K.M. had cut off a vehicle that was attempting to turn onto Belle Chasse Highway. He considered K.M.'s operation of his dirt bike reckless based on these actions.

Agent Francis followed K.M. as he made the illegal u-turn back onto Woodland Highway. He said it was a good thing that the presence of police and the lights from their vehicles caused the other motorists to stop at that intersection. Agent Francis stayed at that intersection with his lights on "[j]ust to hold off the traffic, make sure nobody would get hit." Agent Francis re-urged that human life was foreseeably in danger.

When Agent Francis saw the dirt bike headed north bound, he chose to come from the rear to get in front of dirt bike and execute the box maneuver to block K.M. from engaging with other vehicles. Agent Francis' intent was to maneuver K.M. to the right because Agent Francis "didn't want him [K.M.] to go back to the left with the other traffic on that side of the road." Agent Francis stated "I actually stayed in the left side, slowing - - slowing up to actually force him to go to the right so he wouldn't pass me up on the left." As he watched, Agent Francis saw K.M. get stuck in the rocky, sandy loose gavel on the roadside. Based on the training he received riding motorcycles as a member of the traffic division and his actual visual of the incident, Agent Francis concluded that K.M. attempted to "downshift" the dirt bike to get it unstuck so that K.M. could take off again.

Thereafter, Agent Francis saw Sgt. Dugas exit his vehicle and take K.M. to the ground. The dirt bike fell on both of them. As Agent Francis approached, he heard the sirens going off and could hear Sgt. Dugas yell to K.M. to "[l]et me see your hands. Give me your hands. Give me your hands." He testified that K.M. did not comply whatsoever. Agent Francis detailed his observations as follows:

> While on the ground coming up to the suspect, as they - - like I said, the bike was to top of both of them; the suspect pushing off the ground, trying to - - elbows back and forth [indicating], swing his legs back and forth, side to side, just basically pushing his weight, trying to get away from Sergeant Dugas while he's trying to cuff him.

Agent Francis reiterated that Sgt. Dugas was simultaneously giving K.M. verbal commands for K.M. to show his hands as Sgt. Dugas attempted to handcuff K.M. Agent Francis considered what he saw and heard as resistance and described the attempt to restart the dirt bike as an ongoing flight.

Agent Francis testified that based on K.M.'s failure to comply with the orders of "giving his hands," he decided to give K.M. a "leg strike." Agent Francis described the leg strike as a pain compliance technique that he learned in training. He advised that the purpose of the leg strike is to provide an immediate stun to the area which allows officers to do whatever needs to be done, such as to get a suspect into handcuffs. Agent Francis said his first kick missed K.M. and struck Sgt. Dugas. Agent Francis' second kick hit K.M. on his right leg, above the back thigh. After K.M. was struck by the second kick, Agent Francis said that K.M. began to comply. K.M. gave Sgt. Dugas his hands and Sgt. Dugas was able to handcuff him. In this instance, he said that the leg strike worked as a pain compliance technique.

After K.M. had been handcuffed, Agent Francis went to his unit to shut off his sirens. When he returned to Sgt. Dugas, he heard Sgt. Dugas advising K.M. of

10

his *Miranda* rights. Agent Francis was not involved in the writing of the police report. He said that Deputy Goff prepared the incident report and believed that Sgt. Dugas completed the juvenile arrest probable cause statement.

On cross-examination, Agent Francis agreed that K.M. was being forced off the roadway by the implementation of the box maneuver. He advised that he did not make a verbal or written report of his use of force to anyone, explaining that his use of force had been observed by Sgt. Dugas, his ranking officer. Agent Francis could not describe the tires on K.M.'s dirt bike; however, he said that the principal factors that make a dirt bike an off-road vehicle, as opposed to a motorcycle, are registration and a license plate. Agent Francis did not see the dirt bike exceed speed limits; instead, he saw the dirt bike leave the roadway, run through red lights, and make illegal u-turns. When asked if he saw Sgt. Dugas' vehicle veer from the left lane towards K.M.'s travel lane, he said that Sgt. Dugas only veered into the left lane as he came out of turn, at which time Sgt. Dugas returned to the right lane. Agent Francis stressed that K.M. placed human life in danger by riding on the roadway with no lights and making u-turns. [9]

On re-direct examination, Agent Francis re-stated that any use of force would be reported to his ranking officer, which in the present matter was Sgt. Dugas. He again contended that the use of force to apprehend K.M. was appropriate because K.M. was resisting arrest. In testifying as to the unlawful operation of an off-road vehicle charge, Agent Francis explained that a motorcycle has to have operating lights, turning signals, a license plate, and registration to

---

[9] The trial court allowed the defense to question Agent Francis about a 2019 citation for inconsistencies in his completion of a report. Agent Francis maintained that he got the streets mixed up because he was unaware of the street names. Agent Francis claimed that he was unaware of any complaint being filed against him in connection with the report and that he received no suspension in connection with the complaint.

operate safely on public streets. The driver must also have insurance and a driver's license. Here, he noted that K.M. could not possess a driver's license to operate a motorcycle as a twelve-year old.

On the resisting an officer charge, Agent Francis repeated that during K.M.'s struggle with Sgt. Dugas, he saw K.M. push off the ground, throw his elbows, and push away. At the same time, he heard Sgt. Dugas instruct K.M. to show Sgt. Dugas his hands. Agent Francis clarified that the ability of an officer to see a suspect's hand is important so as to ensure that the suspect does not have anything in his hands to hurt the officer or the suspect.

Regarding the reckless operation of a vehicle charge and aggravated obstruction of a highway charges, Agent Francis averred that the other motorists with green light traffic signals could have gone forward and encountered K.M. on his dirt bike were it not for officers in the area who were stopping traffic. Agent Francis emphasized that everybody's safety is a factor in a pursuit, including the safety of the officer, the suspect, and other people. He testified that the ultimate goal is to stop the suspect from running, hurting, or doing harm to himself or others.

Deputy Dylan Goff

Deputy Goff was called as a defense witness. On the evening of the incident, he stated that he received a dispatch to respond to four-wheelers on Woodland Highway. When he got behind a four-wheeler and the dirt bike, he received a call for service with reference to a hit and run in the tunnel and responded to that call. After an arrest was made of the subject involved in the hit and run accident, he returned to lock-up to book the subject. Deputy Goff did not have any involvement in the detention of K.M. However, he was assigned to write

the report of all the incidents related to the presence of the ATVs and the dirt bike on the roadways.

According to Deputy Goff's report, K.M. eventually stopped. Deputy Goff testified that his report did not include information as to whether K.M. was *Mirandized* or state that K.M. had jerked or swung his arms. The report did reference that K.M's arms and body tensed up. Deputy Goff explained that although he did not personally witness the stop and the arrest of K.M., his report included information on those subjects because it was prepared based on the collective knowledge compiled from the other officers on the scene. He confirmed that Sgt. Dugas told him that K.M. tensed up and had come to a stop. Deputy Goff acknowledged that his report did not include that Agent Francis used the leg strike to kick K.M. Deputy Goff testified that he frequently writes reports from collective knowledge.

On examination by the State, Deputy Goff relayed that sometimes a collective approach is taken to prepare a report where deputies respond to different locations relative to one call. This happened in the present matter where the fleeing ATVs dispersed around the community.

The defense objected when the State attempted to question Deputy Goff about events depicted in the video, arguing that Deputy Goff admittedly did not witness the events of K.M.'s arrest and had no first-hand knowledge of what occurred. The trial court overruled the objection. The trial court cited Agent Francis' testimony and noted that testimony had been elicited throughout the trial premised on what was observed in the video.[10] Deputy Goff went on to testify

---

[10] In overruling the defense's objection to Deputy Goff's testimony regarding events seen in the video, the trial court also stated the following: "Collective knowledge is what he testified to. He

13

that the video showed that at the time that Sgt. Dugas stopped, the fender on the dirt bike "look[ed] like he's trying to keep going." At that moment, it did not appear to Deputy Goff that that K.M. had surrendered. Deputy Goff added that K.M. did not stop the bike, did not get off the bike, did not put his hands behind his back, and did not comply. Deputy Goff said that the act of physically tensing as described by Sgt. Dugas is evidence of opposition or resistance to an arrest.

On re-direct examination by the defense, Deputy Goff identified two occasions in the video where K.M. had the opportunity to put his hands behind his back and did not do so. However, he agreed that K.M. did not have time to place his hands behind his back while he was on the [dirt bike]. In viewing the incident when Sgt. Dugas removed K.M. from the dirt bike, Deputy Goff testified that it appeared that Sgt. Dugas lifted the dirt bike up for a brief moment. Then the bike fell onto both subjects—who he assumed were K.M. and Sgt. Dugas.

wrote the report. That's a part of what he used to write the report. It's in the same video. Same thing."

<u>Deputy Devin Bourgeois</u>

The defense also called Deputy Bourgeois as a witness. Deputy Bourgeois testified that K.M. was already in a unit when he arrived on the scene. He said Sgt. Dugas asked him to place K.M. in Deputy Bourgeois' unit and transport him to the lock-up. After the defense played portions of the video to Deputy Bourgeois, the deputy acknowledged that Sgt. Dugas instructed him to not allow the father to immediately see K.M. Sgt. Dugas directed that "[h]e's not allowed to see his son yet" and that K.M. needed to be detained until "we finish the investigation." Deputy Bourgeois stated that Sgt. Dugas told him to "try to get the names of the other guys" from K.M. if he could.

Deputy Bourgeois reviewed dash cam video footage from Deputy Bourgois' unit, which the defense introduced into evidence. Deputy Bourgeois confirmed that his dash cam video footage showed that when he arrived on the scene—after K.M.'s detention—it appeared that Sgt. Dugas' car windows were rolled up.

**TRIAL COURT JUDGMENT/DISPOSITION**

At the hearing's conclusion, K.M. was adjudicated delinquent on all counts.

Because it was a traffic offense, the trial court began with its reasons for finding that the State had met its burden of proof to adjudicate K.M delinquent for unlawful operation of an off-road vehicle. The trial court noted that the evidence established that the dirt bike was inappropriate for the roadway because it was unregistered; it did not have headlights and signals; it did not have insurance; and it was driven by an unlicensed driver. As such, the trial court noted the dirt bike was not the type of bike to be driven on the highways under those conditions.

The trial court next concluded that the dirt bike was driven in a criminally negligent fashion. It therefore determined that the burden of proof had been met to

adjudicate K.M. delinquent for reckless operation of a vehicle. In reaching that determination, the trial court made several factual findings. The trial court noted that Sgt. Dugas went to the Woodland Highway area in response to a 911 safety call involving ATVs and other motorcycles. Upon arrival, the trail court found that Sgt. Dugas observed traffic violations and thereafter, initiated his overhead lights and sirens. The trial court cited "uncontroverted" testimony from Sgt. Dugas and Agent Francis that their lights and sirens were activated which caused other motorists to stop. The trial court added that the only vehicles that did not stop were the ATVs and K.M.'s dirt bike. With reference to K.M., the trial court made the following observations:

> Again, choices, choices made by a 12-year old to perform dangerous maneuvers, multiple u-turns, crossing of multiple lanes in doing so, putting himself at risk of great bodily harm. Himself. And others. Sheriff's office intervened to try to protect not only the drivers of the ATVs and the motorcycles, but the motorists.

> Was it a perfect police operation? Mr. Thompson has done a great job of showing the deficiencies in their work. However, the video tells the tale of this case. You can see the video. It's in the evidence.

As to the aggravated obstruction of a highway count, the trial court discussed its denial of the defense's motion to quash on the grounds that La. R.S. 14:96 was unconstitutionally vague and overbroad. The trial court reasoned "[a]nd this Court ruled that contextually with the definition of aggra - - aggravated obstruction was - - is right there in front of you. It's a foreseeability where human life is endangered, juxtaposed to aggravated flight, which uses the term 'under the circumstances wherein human life is endangered.'" The trial court found that the State proved beyond a reasonable doubt that it was foreseeable that K.M.'s execution of the above referenced acts endangered human life. Consequently, the trial court adjudicated KM. delinquent for aggravated obstruction of a roadway.

16

The trial court offered the following reasons in adjudicating K.M. delinquent on the aggravated flight count:

> The aggravated flight 14:108.1, I just talked about. "Under circumstances wherein human life is endangered." It doesn't say "other life." It says "human life." The Court finds that there were visual and audible signals, that it's a motorcycle, that it's a very busy highway. That there's a helmet doesn't excuse – and there was no testimony to suggest that [K.M.] was unable to hear what was going on outside his helmet.
>
> Certainly, the maneuvers that he made, the U-turns, southbound on 406, northbound on LA 23, U-turn on LA 23, southbound on LA 23, crossing two lanes on LA 23, northbound on 406, violating a yield sign, violating a stop signal, those are circumstances where human life is endangered.
>
> ***
>
> There was not a car in this intersection, but the Court can see that neither the four wheeler nor the motorcycle, the ATV driven by [K.M.], the drivers of these vehicles did not look to the left. Their helmets did not move to the left. I saw it multiple times, as did you all. Human life was endangered. Your life was endangered. The Court finds the State met its burden and did prove [K.M.] is delinquent for violating 14:108.1.

In reviewing the video, the trial court's reasons for adjudicating K.M. delinquent for resisting an officer encompassed the following:

> The bike continues to travel until it can't travel anymore. There's no testimony that [K.M.] hit the brakes. There's no brake lights on the motorcycle to tell the officer he's willingly bringing the bike to a stop. It stopped after many seconds of travelling along the roadway, off of the roadway between the railroad tracks in the dirt, in the - -the rocks that are - - that are there for the railroad - - and does he get bogged down? I don't know. There's some speculative - - the bike comes to a stop.
>
> And, in the video, you can see the fender moving. What is going on with the bike? Is it the stroke attempting to down shift, as is suggested by Deputy Francis? Is it an attempt to put the kickstand down, as was alluded to by counsel for [K.M.]? Not sure. But what - - what is for certain is the uncontradicted testimony of Sergeant Dugas is that [K.M.]'s hands were on the throttles. That's the testimony. I know there's only one throttle. That's not giving yourself up if your

17

hands are still on the handle bars of the bike and the bike seems to be moving.

The officer had to make a split-second decision to stop reasonably foreseeable dangerous activity of this person operating a bike. He's got a helmet on. He cannot tell the age, the relative age of the operator of the vehicle. He's got a split second to prevent foreseeable danger, loss of human life. And he - - did so. It took milliseconds for it to occur. Was it fun to watch? Of course, it's not. Would it have been fun to watch a head-on collision, a broad-side collision? That would not have been ant fun either. The officer did the best he could under the circumstances. And his uncontroverted testimony was that when taken to the ground and ordered to give up his hands there was resistance. Tensing is resistance.

Officer Francis testified when he got out of his vehicle he observed a tussle. A tussle is a tussle. It's a resistance.

Deputy Goff wrote in his report that [K.M.] surrendered. There was testimony of the same nature from Officer Francis: After a successful blow to the common peroneal nerve, gave himself up. Was it pleasant to watch? Of course, it's not. There - - the Court finds that the State has proven resisting an officer and adjudicates [K.M] delinquent for 14:108 as well.

After the adjudication of delinquency on all counts, the trial court ordered a PDI and fixed the matter for a disposition hearing. At the disposition hearing, the trial court sentenced K.M. to six (6) months for reckless operation of a vehicle, suspended, and two (2) years of probation; fifteen (15) days, suspended, for unlawful operation of an off-road vehicle and two (2) years of probation; two (2) years, suspended, and two (2) years of probation for aggravated obstruction of a highway; two (2) years, suspended for aggravated flight from an officer, and two (2) years of probation; and ninety (90) days, suspended, with two (2) years on probation for resisting an officer. All the sentences were to run concurrently.

This timely appeal followed.

**ERROR PATENT**

18

Louisiana jurisprudence is well-established that a juvenile proceeding is entitled to an error patent review pursuant to La. Ch.C. art. 104 and La. C.Cr.P. art. 920. *See State ex rel. A.H.*, 2010-1673, p. 9 (La. App. 4 Cir. 4/20/11), 65 So.3d 679, 685. In accordance therewith, the record herein reveals an error patent that requires review by this Court. The Children's Code articles and jurisprudence mandate that the trial court find that the juvenile violated a specific statute or ordinance in order to support an adjudication of delinquency. *See State in Interest of K.K.*, 2014-479, p. 2 (La. App. 3 Cir. 12/17/14), 153 So.3d 1280, 1281. In the present matter, the written Adjudicated Family in Need of Services/Delinquent Disposition Order ("disposition order") does not delineate the specific offenses for which K.M. was adjudicated delinquent. Notwithstanding, as discussed hereinabove, the trial transcript of the adjudication hearing reflects that the trial court expressly designated the specific statues violated in adjudicating K.M. delinquent. "Where there is a conflict between the transcript and the minute entry, the transcript controls." *State v. Randall*, 2010-0027, p. 3 (La. App. 4 Cir. 10/27/10), 51 So.3d 799, 802. As such, the absence of the specific charges supporting the basis for K.M.'s adjudication in the minute entry of the disposition order constitutes harmless error.[11] Accordingly, this Court shall continue its review of the merits of K.M's appeal.

## LAW/DISCUSSION

K.M. assigns the following errors: (1) the trial court erred in denying K.M.'s motion to quash relative to the constitutionality of La. R.S. 14:96—aggravated obstruction of highway; (2) the evidence was insufficient to support K.M.'s

---

[11] The sentencing order also specified the offenses for which K.M. was adjudicated delinquent and the sentence imposed for each statutory violation.

19

adjudication for La. R.S. 14:108.1—aggravated flight; (3) the evidence was insufficient to support K.M.s adjudication for violation of La. R.S. 14:108—resisting an officer; and (4) the trial court erred in allowing impermissible hearsay testimony from Deputy Goff regarding the video based on Deputy Goff's lack of first-hand knowledge as to the video's contents.

### Constitutionality of La. R.S. 14:96-Aggravated Obstruction of a Highway

La. R.S.14:96(A) provides that "[a]ggravated obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, wherein it is feasible that human life might be endangered." In the matter *sub judice*, K.M. contends that the statute is vague and overbroad because it fails to clearly define the law or provide explicit standards for the individuals who must apply the law.

"A statute is constitutionally vague if an ordinary person of reasonable intelligence is not capable of understanding its meaning and conforming his conduct thereto." *State in Interest of L.C.*, 2011-1703, p. 3 (La. App. 4 Cir. 10/23/13), 126 So.3d 768, 770. A criminal statute must comply with two requirements to satisfy due process under the void for vagueness doctrine: (1) provide adequate notice to individuals that certain conduct is proscribed; and (2) provide adequate standards to those charged with determining the accused's guilt or innocence. *Id*. Constitutional challenges to a statute because it is overbroad or the "overbreadth doctrine" involve challenges made under the First Amendment, in particular, free speech—not conduct. *See State v. Smith*, 2013-2318, pp. 6-7 (La. 1/28/14), 144 So.3d 867, 872-73. The overbreadth doctrine is used sparingly and only as a last resort. *Id.*, 2013-2318, p. 7, 144 So.3d at 873. In general, statutes are

20

presumed to be constitutional; hence, the party challenging the constitutionality of the statutes bears the burden of proof. *State in Interest of L.C.*, 2011-1703, p. 1, 126 So.3d at 769.

In applying the aforementioned precepts, K.M. has not met his burden to prove that La. R.S. 14:96(A) is constitutionally vague or overbroad. As to vagueness, we first note that the statute clearly and unambiguously conditions a finding of aggravated flight on circumstances "where human life might be endangered." We find this condition is clear for an ordinary person of reasonable intelligence to understand and to conform his/her conduct accordingly. Moreover, the condition is clear for law authorities who must enforce the statute. Courts are bound to a strict interpretation of statutory provisions when the words of a statute are clear and unambiguous. *Kunath v. Gafford*, 2020-01266, p. 5 (La. 9/30/21), 330 So.3d 161, 164. Here, Sgt. Dugas and Agent Francis each testified that K.M might have endangered human life, including his life and that of other motorists, when he ran red lights, disregarded traffic control signals, made illegal u-turns, and operated a vehicle that did not have headlights on a busy roadway at night. The trial court, in its reasons for judgment, also delineated the instances in which it found that K.M.'s operation of his dirt bike, not only foreseeably endangered human life, but also, in fact, endangered his life. In contrast, the defense put on no evidence to support that K.M. was not of reasonable intelligence and did not understand the statute's meaning.

Likewise, K.M.'s overbroad claim also fails. Specifically, La. R.S. 14:96(A) proscribes conduct, namely, performance of an act that places human life in foreseeable danger. The statute does not restrict free speech which implicates the First Amendment. As the prohibited conduct in the statute and its application

to the present facts do not relate to free speech, any invalidation of the statute based on the overbreath doctrine is inappropriate. Accordingly, because the evidence was sufficient to adjudicate K.M. delinquent on the merits, this assignment of error is without merit.

### *Sufficiency of the Evidence*

The State must prove beyond a reasonable doubt that the child committed the delinquent act as alleged in the petition in order to adjudicate a child delinquent. *State in Interest of J.W.*, 2012-0048, p. 3 (La. App. 4 Cir. 6/6/12), 95 So.3d 1181, 1184. In that decision, the Court espoused the following in discussing the sufficiency of the evidence for a juvenile adjudication.

> In light of the due process protections of the Fourteenth Amendment of the United States Constitution, and in evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The *Jackson* standard has been held to be the clear standard of review for Louisiana appellate courts by the Louisiana Supreme Court. *State v. Brown,* 2003–0897 (La. 4/12/05), 907 So.2d 1, 18. This standard of review is applicable in juvenile delinquency cases. *State in the Interest of C.B.,* 2009–1114, p. 5 (La. App. 4 Cir. 12/16/09), 28 So.3d 525, 527.
>
> Louisiana Constitution Article V, § 10(B) mandates that an appellate court review both law and facts when reviewing juvenile adjudications. Therefore, as in the review of civil cases, a factual finding made by a trial court in a juvenile adjudication may not be disturbed by an appellate court unless the record evidence as a whole does not furnish a basis for it, or it is clearly wrong. *State in the Interest of Batiste*, 367 So.2d 784 (La.1979). In sum, we apply the "clearly wrong-manifest error" standard of review to determine whether there is sufficient evidence to satisfy the standard of proof beyond a reasonable doubt. *State in the Interest of T.C.*, 2009–1669, p. 3 (La. App. 4 Cir. 2/16/11), 60 So.3d 1260, 1262.

A reviewing court must give great deference to the credibility determinations and assessment of witness testimony made by the juvenile court. *Id.*

*Aggravated Flight*

La. R.S. 14:108.1 provides, in pertinent part, the following:

A. No driver of a motor vehicle or operator of a watercraft shall intentionally refuse to bring a vehicle or watercraft to a stop knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle or marked police watercraft.

\*\*\*

C. Aggravated flight from an officer is the intentional refusal of a driver to bring a vehicle to a stop or of an operator to bring a watercraft to a stop, under circumstances wherein human life is endangered, knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver or operator has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle or marked police watercraft.

D. Circumstances wherein human life is endangered shall be any situation where the operator of the fleeing vehicle or watercraft commits at least two of the following acts:

(1) Leaves the roadway or forces another vehicle to leave the roadway.

(2) Collides with another vehicle or watercraft.

(3) Exceeds the posted speed limit by at least twenty-five miles per hour.

(4) Travels against the flow of traffic or in the case of watercraft, operates the watercraft in a careless manner in violation of R.S. 34:851.4 or in a reckless manner in violation of R.S. 14:99.

(5) Fails to obey a stop sign or a yield sign.

(6) Fails to obey a traffic control signal device.

K.M. argues that the State failed to prove beyond a reasonable doubt that he had violated the requisite number of provisions under the statute to support an adjudication for aggravated flight. As to La. R.S. 14:108.1(C), K.M. argues that the State he did not receive the mandatory visual and audible signals to stop by a

police officer because the indicators on Sgt. Dugas' unit showed that Sgt. Dugas' sirens were not activated. Moreover, K.M. contests that the State failed to show he committed two of the acts outlined in La. R.S. 14:108.1(D) wherein human life was endangered. He contends that he only left the roadway because he was forced off the road when Sgt. Dugas veered into K.M.'s dirt bike and later, when the box maneuver executed by Sgt. Dugas and Agent Francis. K.M. also notes that the State offered no evidence that he was speeding or collided with another vehicle or travelled against the flow of traffic. He further represents that the State did not prove he failed to yield or obey a stop sign. However, a review of the evidence and the findings made by the trial court contradict K.M.'s arguments.

At the outset, the trial court made a factual finding that Sgt. Dugas' sirens and overhead lights were activated. In reaching this finding, the trial court relied on the "uncontroverted" testimony of Sgt. Dugas. The trial court noted Sgt. Dugas' unequivocal testimony that his sirens were activated when he yelled out to K.M. to stop. The trial court also referenced Agent Francis' testimony that Sgt. Dugas' sirens were on, along with the sirens of other officers. Although K.M. questions the credibility of Sgt. Dugas and Agent Francis and cites Sgt. Dugas' acknowledgment that his unit's indicators did not show that his sirens had been deployed, "[d]eterminations of witness credibility are within the province of the trier of fact, and the mere existence of contradictory testimony does not create reasonable doubt." *State in Interest of A.J.*, 2014-0595, p. 6 (La. App. 4 Cir. 10/1/14), 151 So.3d 659, 665.

Moreover, as previously referenced herein, in considering the constitutionality of La. R.S. 14:14:96, the testimony of Sgt. Dugas and Agent Francis, and its review of the video, the trial court found that the various improper

u-turns, the crossing of lanes of traffic, and the violation of yield and stop sign traffic signals by K.M. created circumstances wherein K.M. endangered human life. An appellate court may not disturb a trial court's factual finding in a juvenile proceeding unless the record as a whole does not furnish a basis for the finding or it is clearly wrong. *Id.*, 2014-0595, p. 4, 151 So.3d at 664. Our review of the record does not show that the trial court was clearly wrong or had no basis for its findings. Indeed, the record supports that K.M. received visual and audible signs to stop, failed to obey a stop or yield sign, and a traffic control signal device. Accordingly, the State satisfied the elements to support an adjudication for aggravated flight. This assignment of error, therefore, lacks merit.

*Resisting An Officer*

La. R.S. 14:108 defines the offense of resisting an officer, in relevant part, as the following:

A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

B. (1) The phrase "obstruction of" as used herein shall, in addition to its common meaning, signification, and connotation mean the following:

(a) Flight by one sought to be arrested before the arresting officer can restrain him after notice is given that he is under arrest.

In this assignment of error, K.M. claims the State did not prove beyond a reasonable doubt that K.M. offered any resistance to Sgt. Dugas' ability to arrest him. K.M. maintains that any struggle between he and Sgt. Dugas resulted from the fact that the hot dirt bike had fallen on Sgt. Dugas and K.M. after Sgt. Dugas

had tossed K.M. off the dirt bike. He alleges that his actions were not an attempt to prevent Sgt. Dugas from placing handcuffs on him. K.M. reiterates his claim that Sgt. Dugas' sirens were not on during the time Sgt. Dugas followed K.M. As such, K.M. argues that the trial court erred to the extent that its reasons for judgment suggest that the trial court based its resisting an officer adjudication on K.M.'s alleged flight. K.M. emphasizes that he had not been placed on notice of his arrest until after he was tossed of the dirt bike, kicked, and subsequently placed under arrest. Upon review, we find K.M.'s arguments are not persuasive.

First, the trial court refuted K.M.'s claim that there was no evidence of resistance premised on flight because he lacked notice of Sgt. Dugas' intent to detain him as Sgt. Dugas' sirens were not activated. In fact, the trial court expressly found that the sirens were activated. Further evidence of flight was underscored by Sgt. Dugas' testimony that K.M. saw Sgt. Dugas when Sgt. Dugas initially moved alongside the dirt bike and notwithstanding, ignored Sgt. Dugas' demands to stop and pull over. In conjunction therewith, the trial court found that after repeated evasive maneuvers, the dirt bike did not stop immediately, even after the execution of the box maneuver. Instead, the dirt bike continued to travel "until it [couldn't] travel anymore." The trial court also considered the fact that K.M.'s hands remained on the handle bars as evidence that K.M. had not given himself up.

Next, the trial court did not rely exclusively on K.M.'s apparent efforts to flee after directives to stop and the execution of the box maneuver in its determination that K.M. "resisted" Sgt. Dugas. It also found that K.M. offered resistance by tensing his body when Sgt. Dugas ordered him to give up his hands. Sgt. Dugas, Agent Francis, and Deputy Goff each testified that "tensing" is a form of resistance. Sgt. Dugas asserted that he gave repeated orders for K. M. to show

his hands as he attempted to handcuff him; however, K.M. only stopped his resistance when Sgt. Francis applied the "leg strike" pain compliance technique. Agent Francis also stated that he observed a struggle between Sgt. Dugas and K.M.

In reviewing the evidence in its totality, the record supports that K.M. intentionally interfered with and offered opposition to Sgt. Dugas' attempt to detain him. Accordingly, we find that the State satisfied the elements of La. R.S. 14:108 to substantiate K.M.'s adjudication of delinquency for resisting an offer. Therefore, this assignment of error lacks merit.

**Deputy Goff's Video Testimony/Hearsay**

K.M. argues in his final assignment of error that the trial erred in permitting the State to examine Deputy Goff, the writer of the police report, about events depicted in the video. K.M. highlights that the facts contained in Deputy Goff's police report about K.M.'s arrest were based on the "collective knowledge" of others, particularly, Sgt. Dugas. Therefore, K.M. suggests that because Deputy Goff had no first-hand knowledge of the circumstances surrounding K.M.'s arrest and did not personally observe the events contained in the video, Deputy Goff's testimony was improper because it constituted hearsay. We disagree.

In our analysis of this error, we begin with providing context to the circumstances under which Deputy Goff was called as a witness for the defense. As referenced herein, Deputy Goff confirmed on direct examination that he did not personally see the arrest of K.M. He verified that Sgt. Dugas reported to him that K.M. tensed his arms, and at some point, came to a stop and appeared to surrender. On cross-examination by the State, Deputy Goff testified that he recognized the video. The trial court overruled defense objections to Deputy Goff's testimony about the video's contents, noting that Sgt. Dugas and Agent Francis had been

permitted to testify about the video's contents without objection. After the trial court overruled the defense's objection, Deputy Goff confirmed that the activity shown in the video depicted events that occurred prior to K.M.'s arrest. In answering the State's questions as to what was depicted in the video, Deputy Goff relayed that the video showed that Sgt. Dugas was slowing and that Agent Francis had come to a stop. He said that the movement of the fender looked as though the dirt bike was trying to keep going and at that moment, it did not appear that K.M. had surrendered. Deputy Goff averred that K.M. did not get off the bike, put his hands behind his back, and comply.

La. C.E. art. 801(C) defines hearsay as "a statement other than one made by the declarant while testifying at the present trial or hearing offered into evidence to prove the truth of the matter asserted." A statement not offered for the truth of the matter asserted is not considered hearsay. *See State v. Cyrus*, 2011-1175, p. 23 (La. App. 4 Cir. 7/5/12), 97 So.3d 554, 567. This Court distinguished the difference between hearsay and non-hearsay testimony of an investigating officer in *State v. Jefferson*, 2019-0522, p. 12 (La. App. 4 Cir. 8/9/22), 302 So.3d 567, 576, explaining that "[w]here an investigating officer testifies concerning events leading to the arrest of a defendant, statements are not hearsay if offered merely to explain the officer's actions and not for the truth of the matter asserted." In applying this distinction in this matter, we find that Deputy Goff's testimony regarding the video was not to prove the truth of any an out-of-court statement made to him by Sgt. Dugas or any other party. Rather, Deputy Goff's testimony was offered to explain the actions of the arresting officer and K.M.'s surrounding K.M.'s arrest based on Deputy Goff's observations of the video's contents.

A reviewing court should not reverse the trial court's ruling on the admissibility of evidence absent an abuse of discretion. *Id.*, 2019-0522, p. 12, 302 So.3d at 576-77 (citation omitted). Here, we find no abuse of the trial court's discretion in admitting Deputy Goff's testimony into evidence. Moreover, in the event that Deputy Goff's testimony constituted improper hearsay, which we found it did not, the admission of Deputy Goff's testimony amounted to harmless error. Improperly admitted hearsay evidence is harmless error where it is cumulative and corroborative of other evidence properly admitted into evidence and does not contribute to the verdict. *In re Benson*, 2015-0874, p. 15 (La. App. 4 Cir. 2/24/16), 216 So.3d 950, 960 (citation omitted). In this case, the video had already been admitted into evidence and Sgt. Dugas and Agent Francis had testified that the video corroborated their assertions that K.M. had resisted arrest. Thus, Deputy Goff's testimony was cumulative of the testimony previously admitted into evidence. Accordingly, this assignment of error is meritless.

## CONCLUSION

We find that La. R.S. 14:96—aggravated obstruction of a highway— is constitutional; that the evidence was sufficient to adjudicate K.M. delinquent for reckless operation of a vehicle, unlawful operation of an off-road vehicle,[12] aggravated obstruction of a highway, aggravated flight, and resisting an officer;

---

[12] The defense did not specifically brief K.M.'s adjudication for unlawful operation of an off-road vehicle as an assigned error. Notwithstanding, we find that Sgt. Dugas' and Agent Francis' testimony that K.M.'s dirt bike was unregistered, lacked tail lights, and that K.M. was an under-aged and unlicensed driver met the elements for the trial court to adjudicate K.M. delinquent on that count.

and that the trial court properly admitted Deputy Goff's testimony regarding the video into evidence.

Based on the foregoing reasons, we affirm K.M.'s delinquency adjudication and disposition.

**AFFIRMED**